**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BAYMONT FRANCHISE SYSTEMS,**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**SB HOSPITALITY PALM SPRINGS, LLC; NAM MIN CHO; and HANHE CHO,**<br><br>          **Defendants.** | Civ. No. 19-06954 (KM) (MAH)<br><br>**OPINION** |

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

      In 2016, SB Hospitality Palm Springs, LLC ("SB Hospitality"), an LLC controlled by Nam Min Cho, signed various contracts with Baymont Franchise Systems ("Baymont" or "BFS") in order to run a Baymont hotel franchise. In addition, Nam Min Cho and Hanhe Cho personally guaranteed SB Hospitality's obligations under the agreement and made a Note. In May 2018, SB Hospitality terminated the agreement, claiming that Baymont's reservation system failed to function properly. Baymont brought this case seeking hundreds of thousands of dollars of damages, interest, and attorneys' fees due under the contracts. Baymont now moves for summary judgment (DE 49)[1] on four of its Counts as

---

[1]    For ease of reference, certain key items from the record will be abbreviated as follows:

|  |  |  |
|---|---|---|
| "DE_" | = | Docket Entry in this Case |
| "Compl." | = | Complaint (DE 1) |
| "PSOMF" | = | Plaintiff's statement of material facts (DE 49-3) |
| "Pl. Br." | = | Baymont's brief in support of its motion for summary judgment (DE 49-8) |

well as on SB Hospitality's four counterclaims and two asserted defenses. For the reasons set forth below, the motion is **GRANTED in part and DENIED in part.**

## I.   Background

Baymont does not operate any hotels directly, but instead franchises its brand and systems to others. (PSOMF ¶ 6.) SB Hospitality is a California LLC. (*Id.* ¶ 3.) Nam Min Cho and Hanhe Cho are both members of the LLC. (*Id.* ¶ 3–4.) On September 29, 2016, Baymont and SB Hospitality entered into several agreements to operate a Baymont facility in Palm Springs, CA. (*Id.* ¶ 7, 9.) Specifically, Baymont and SB Hospitality signed a Franchise Agreement and a SynXis Subscription agreement. (*Id.* ¶ 7, 9.)

The Franchise Agreement obligated SB Hospitality to operate the hotel as a Baymont facility for twenty years. (*Id.* ¶ 13.) During that twenty-year term, SB Hospitality was required to pay Baymont certain recurring fees and provide monthly reports on revenue and other information. (*Id.* ¶ 14–22.) If the agreement was terminated early, the contract stipulated that SB Hospitality would owe liquidated damages, calculated based on the average revenue the facility generated. (*Id.* ¶ 25.) In addition, the Franchise Agreement contained both an integration clause and a clause stating that "[SB Hospitality] release[s] any claim against [BFS] or [BFS' s] agents based on any oral or written representation or promise not stated in this [Franchise] Agreement."[2] (*Id.* ¶ 27–28.) The Franchise Agreement provides that it is governed by New Jersey law. (DE 49-7, Ex. A § 17.6.1.)

---

        "Opp."        =    SB Hospitality's brief in opposition to Baymont's motion for summary judgment (DE 54)

[2]    The Franchise Agreement also provides that "[SB Hospitality] acknowledge[s] that no salesperson has made any promise or provided any information to [SB Hospitality] about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this [Franchise] Agreement." (*Id.* ¶ 29.)

Critical to the defendants' position is Baymont's obligation to "operate and maintain … a computerized Reservation System or such technological substitute(s) as we determine, in our [*i.e.,* Baymont's] discretion." (Franchise Agreement § 4.2.) That reservation system was known as SynXis, and SB Hospitality signed a second agreement related to SynXis. (*Id.* Ex. B.; PSOMF ¶ 9.) The SynXis agreement obligates Baymont to "use commercially reasonable efforts to make the [reservation system] available twenty-four (24) hours a day, seven (7) days a week except for: (i) planned downtime or (ii) any unavailability caused by circumstances beyond Franchisor's reasonable control." (DE 49-7, Ex. B. § 4.6.) It also contains a warranty stating that the reservation system would "perform the functions and operations in a good workmanlike manner." It also required SB Hospitality to "(a) follow [BFS]'s instructions, updates and modifications; (b) make corrections, as directed; (c) [pay] all applicable [SynXis] Fees when due; and (d) … not otherwise [be] in default under the SynXis Agreement, or the Franchise Agreement," and stated that Baymont's sole responsibility "shall be to use reasonable efforts to remedy any nonperformance of the SynXis System within a reasonable time after [SB Hospitality] reports such nonperformance to [BFS]." (PSOMF ¶ 10; DE 49-7, Ex. B. § 10.1.) In addition, SB Hospitality agreed to "waive, release and renounce any all claims or causes of action it may have against [BFS] … arising out of the [SynXis System] unless due to [BFS's] willful misconduct."[3] (PSOMF ¶ 11.)

---

[3]     This section, 10.4, reads in full "**10.4 DISCLAIMER.** The above warranties shall be rendered null and void if the [SynXis system] is subjected to abuse. Misuse, improper installation at the facility or maintenance by unauthorized service personnel, or if the [SynXis system] is altered without franchisor's express consent or direction. Or used for a purpose not authorized under this agreement or if the [SynXis system] is damaged or destroyed due to acts of nature, war, terrorism, civil unrest, fires, natural disasters, or other events beyond franchisor's control. **Except as provided in this section 10** franchisor makes no warranties whatsoever, express or implied, including without limitation any warranty about the [SynXis system] or any services, their merchantability or their fitness for any particular purpose. Franchisor makes no representation or warranty whatsoever regarding the volume of reservations or amount of revenues that the facility may attain through the use of the [SynXis system] or in connection with the receipt of any services or that franchisee's reservations or revenue will increase. Franchisee on behalf of itself, its successors and assigns, hereby waives,

Nam Min Cho and Hanhe Cho personally guaranteed SB Hospitality's obligations to Baymont. (*Id.* ¶ 32–34.) The guaranty stated that upon a default under the Franchise Agreement, these two individuals would "immediately make each payment and perform or cause [SB Hospitality] to perform, each unpaid or unperformed obligation of [SB Hospitality] under the [Franchise] Agreement," as well as pay attorneys' fees (*Id.* ¶ 35–36.)

Finally, SB Hospitality, Nam Min Cho, and Hanhe Cho co-made a $50,000 "Development Incentive Note." (*Id.* ¶ 37.) The note would be forgiven at a rate of one-seventh per year, but if the Franchise Agreement is terminated "for any reason … the outstanding, unamortized principal balance of this Note shall be immediately due and payable without further notice, demand or presentment." (*Id.* ¶ 39.)

On May 1, 2018, SB Hospitality told Baymont of its intent to terminate the Franchise Agreement based on issues with the performance of the SynXis reservation system. (*Id.* ¶ 42.) Baymont encouraged SB Hospitality not to do so, and claimed that the issues were resolvable with more training. (*Id.* ¶ 43–44.) On June 5, 2018, SB Hospitality terminated the Franchise Agreement, but Baymont did not respond; SB Hospitality again informed Baymont of its termination on July 5, 2018. (*Id.* ¶ 45–46.) On July 9, 2018, Baymont acknowledged SB Hospitality's termination, effective July 31, 2018, and demanded $320,434.73 in damages under the Franchise Agreement. (*Id.* ¶ 47.) Including damages, interest, and attorneys' fees, Baymont now demands $695,024.99. (*Id.* ¶ 61.)

Baymont filed this action on February 26, 2019, and defendants jointly filed an answer with counterclaims on June 10, 2019. (DE 1, 19.) After discovery, Baymont moved for summary judgment on four Counts of its

---

releases and renounces any and all claims or causes of action it may have against franchisor, franchisor's affiliates, or franchisor's or their officers, directors or agents arising out of the [SynXis system] **unless due to franchisor 's willful misconduct.** (DE 49-7, Ex. B (emphasis added, capitalization standardized).)

4

complaint (Counts 2, 4, 6, and 7), on SB Hospitality's four counterclaims, and on SB Hospitality's two asserted defenses. (DE 49.)

Count 2 demands liquidated damages under the Franchise Agreement. (Compl. ¶ 34–39.) Count 4 demands that SB Hospitality pay unpaid recurring fees. (*Id.* ¶ 44–47.) Count 6 demands payment from Nam Min Cho and Hanhe Cho pursuant to their guaranty. (*Id.* ¶ 52–55.) Finally Count 7 demands payment on the Note that Nam Min Cho, Hanhe Cho, and SB Hospitality co-made. (*Id.* ¶ 56–64.) Defendants' four counterclaims are for 1) breach of contract, 2) breach of warranty, 3) violation of the New York Franchise Sales Act, and 4) tortious interference with prospective economic advantage. (DE 19 ¶ 15–33.) In addition, in their brief in opposition to summary judgment, defendants assert the defenses, first raised in their answer, that that the contract was procedurally unconscionable and that they were fraudulently induced to sign. (Opp. at 4–10.) Baymont filed a reply. (DE 57.) This motion is fully briefed and ripe for decision.

## II.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249–50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250–51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

## III.   Discussion

I first discuss certain counterclaims and defenses which fail as a matter of law and, as to these, grant summary judgment in favor of Baymont. (Section III.A) I then discuss the remaining claims, counterclaims, and defenses, on

which summary judgment is precluded by disputed issues of material fact.
(Section III.B)

## A. Counterclaims and defenses on which summary judgment is granted

I grant summary judgment in favor of Baymont on SB Hospitality's New
York Franchise Sales Act counterclaim, tortious interference counterclaim, and
asserted unconscionability defense.

### 1. New York Franchise Sales Act

The New York Franchise Sales Act ("NYFSA"), N.Y. Gen. Bus. Law § 680,
*et seq.*, imposes certain disclosure requirements on franchise transactions that
take place within New York State or where the franchisor is based in New York
State. N.Y. Gen. Bus. Law § 681(12).[4] SB Hospitality is a California LLC, the
facility was located in Palm Springs, CA, and no part of the transaction
occurred in New York. Defendants' argument therefore relies on the assertion
that Hanhe Cho was a resident of New York when the Franchise Agreement
was signed.[5] Her residence, however, is not relevant because by its plain terms
the NYFSA does not apply to out-of-state transactions involving out-of-state
franchises. In short, the NYFSA is "applicable only to specific transactions
solicited or accepted in New York, or affecting New York." *JM Vidal, Inc. v.
Texdis USA, Inc.*, 764 F. Supp. 2d 599, 616 (S.D.N.Y. 2011). None of those

---

[4]     The relevant section reads in full "(a) An offer or sale of a franchise is made in
this state when an offer to sell is made in this state, or an offer to buy is accepted in
this state, or, if the franchisee is domiciled in this state, the franchised business is or
will be operated in this state. (b) An offer to sell is made in this state when the offer
either originated from this state or is directed by the offeror to this state and received
at the place to which it is directed. An offer to sell is accepted in this state when
acceptance is communicated to the offeror from this state." N.Y. Gen. Bus. Law §
681(12)(a)–(b).

[5]     Baymont contests the truth of this assertion, but it is immaterial, as the NYFSA
does not apply even if Hanhe Cho was a resident of New York. (DE 57 at 3.) What is
more, the franchise agreement is governed by New Jersey law. (DE 49-7, Ex. A §
17.6.1.)

factors are present here, so I must grant summary judgment in favor of Baymont on defendants' third counterclaim.

### 2. Tortious Interference

SB Hospitality's claim of tortious interference with prospective economic advantage involves Baymont's failure to respond to SB Hospitality's notice of termination for nearly two months, thus preventing it from accepting bookings from third party websites. (DE 19 ¶ 30–33.) To properly allege a claim for tortious interference, a party must demonstrate "(1) the existence of a reasonable expectation of economic advantage; (2) an intentional and malicious interference with that expectation by the defendant; (3) a causal connection between the interference and the loss of the prospective gain; and (4) damage." *Espinosa v. Cnty. of Union*, 212 F. App'x 146, 157 (3d Cir. 2007). Nowhere does SB Hospitality present facts demonstrating either that Baymont's failure to acknowledge the notice of termination was malicious or that it actually lost any bookings as a result of that lack of acknowledgment. Instead, in their opposition brief, defendants merely assert in conclusory fashion that "significant issues of material fact exist as to Defendants' breach of contract and NYSFA claims." (Opp. at 15–16.)

I therefore grant summary judgment in favor of Baymont on defendants' fourth counterclaim.

### 3. Unconscionability

Defendants argue that the contract was void *ab initio* for procedural unconscionability because Nam Min Cho cannot speak or read English and was never provided with a Korean translation of the Franchise Agreement. This defense fails.

It has long been established that "where a party affixes [her] signature to a written instrument, ... a conclusive presumption arises that [she] read, understood and assented to its terms and [she] will not be heard to complain that [she] did not comprehend the effect of [her] act in signing." *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386,

403 (3d Cir. 2020) (quoting *Peter W. Kero, Inc. v. Terminal Const. Corp.*, 6 N.J. 361 (1951)). Courts, however, "may refuse to enforce contracts that are unconscionable." *Saxon Const. & Mgmt. Corp. v. Masterclean of N. Carolina, Inc.*, 273 N.J. Super. 231, 236 (App. Div. 1994). Procedural unconscionability "can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process," but must be evaluated on a case-by-case basis. *Muhammad v. Cnty. Bank of Rehoboth Beach, Delaware*, 189 N.J. 1, 15–16 (2006).

Here, the sole fact supporting a finding of procedural unconscionability is that Nam Min Cho is not sufficiently fluent in the English language. (Opp. at 8–9.) New Jersey courts have held that the mere inability to speak English is not sufficient to void a contract. *Rashabov v. Alfuso*, No. A-3684-08T1, 2010 WL 3932899, at *4 (N.J. Super. Ct. App. Div. Sept. 28, 2010). What is more, Baymont provided Nam Min Cho with a "Franchise Disclosure Document" approximately three weeks before he signed the various agreements. (DE 57 at 7; DE 57, Ex. C.) The Disclosure Document included copies of the Franchise Agreement and SynXis subscription agreement. Nam Min Cho therefore had sufficient time to obtain a translation of the document before signing, if he felt it necessary. That he failed to do so is no basis to declare the contract void for procedural unconscionability. I must therefore grant summary judgment in favor of Baymont on this asserted defense.

**B. Summary judgment denied as to the remaining claims, counterclaims, and defenses**

I deny summary judgment as to the remaining claims, counterclaims, and defenses because there are disputed issues of material fact relating to whether Baymont initially breached the Franchise Agreement and the SynXis warranty, as well as whether there was fraud in the inducement due to Baymont's alleged misrepresentations. Depending on its findings of fact, a jury could conclude that defendants' performance was excused and that they do not

owe damages to Baymont.[6] I first discuss the disputed facts related to Baymont's alleged breach of the Franchise Agreement, then discuss the SynXis Warranty, and finally discuss Baymont's alleged fraud in the inducement.

### 1. Breach of Franchise and SynXis Agreements

If Baymont breached the contract before SB Hospitality terminated it, SB Hospitality would be excused from performance. "It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance ... Whether conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions." *Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.*, 357 F. Supp. 2d 788, 797 (D.N.J. 2005) (quoting *Magnet Resources, Inc. v. Summit MRI, Inc.*, 318 N.J. Super. 275 (1998)).

This case is remarkably similar to *Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.*, 357 F. Supp. 2d 788 (D.N.J. 2005). That case, involving the same type of hotel franchise agreement at issue here, centered on allegations that the franchisor breached the contract for reasons related to the online booking system. *Id.* at 793. The franchisee, Honeysuckle Enterprises, claimed that its breach was excused because Travelodge first breached the agreement by failing to place Honeysuckle on its online reservation system, thus drastically reducing the number of reservations made. *Id.* at 793. The court found that there was conflicting evidence as to whether Honeysuckle had properly been added to the reservation system, and thus largely denied summary judgment, based on disputed issues of material fact.[7] *Id.* at 797.

---

[6]     If SB Hospitality is excused from performance and therefore from paying damages, Nam Min Cho and Hanhe Cho would also be freed from any obligation to pay damages under their guaranty. The Note similarly was made "pursuant to the Franchise Agreement" and therefore, again, if SB Hospitality is excused from performance on the Franchise Agreement defendants are excused from paying the balance on the Note. (DE 49-7, Ex. D.)

[7]     It did, however, grant summary judgment in favor of Travelodge on tortious interference and unconscionability claims.

Here, as in *Honeysuckle Enterprises*, there are several disputed factual issues related to Baymont's alleged breach of the Franchise Agreement. First, Baymont acknowledges that it was required by the contract to provide SB Hospitality with a working SynXis system, and that the failure to provide a working system would be a material breach of both the Franchise Agreement and the SynXis subscription agreement. (DE 49-7, Ex. A, § 4.2; *id.*, Ex. B § 2–3.) Baymont, however, attempts to distinguish *Honeysuckle* by arguing that here, SB Hospitality was not denied access to the SynXis system. Having afforded access to SB Hospitality, Baymont was required only to make "reasonable efforts" to provide support for the system if it did not work. (DE 57 at 9.) In short, Baymont argues that the reason SB Hospitality could not get the SynXis system to work properly was the incompetence of its employees. (DE 57 at 10 ("Defendants' alleged issues with the SynXis System are attributable to their own operational errors and failure to attend training in accordance with the Franchise Agreement.").) In contrast, SB Hospitality argues that the system never worked properly and that its deficiencies, e.g., the system randomly crashing at check-in time, cannot be attributed to human error. (Opp. at 11–13; DE 49-7, Ex. E.) Each side has provided evidence for its position, and there are several material facts in dispute. Among these contested issues of fact are: Would SB Hospitality's SynXis system have functioned better if the staff was better trained? Was the system itself flawed to a degree that no amount of training would have remedied the issues? Did Baymont's attempts at technical support fulfill its contractual obligations?

On this record, a rational jury would not need to, but could, find that Baymont and not SB Hospitality initially breached the Franchise Agreement and therefore find that SB Hospitality's performance was excused. I therefore must deny Baymont's motion for summary judgment on Counts 2, 4, 6, and 7 of the complaint.

## 2. SynXis Warranty

Next, I deny summary judgment with regard to SB Hospitality's second counterclaim, alleging that Baymont breached the warranty included in the SynXis subscription agreement.

"To state a claim for breach of express warranty, a plaintiff must show: "(1) that [the defendant] made an affirmation, promise or description about the product; (2) that this affirmation, promise or description became part of the basis of the bargain for the product; and (3) that the product ultimately did not conform to the affirmation, promise or description." *BK Trucking Co. v. Paccar, Inc.*, No. CV 15-2282 (JBS/AMD), 2016 WL 3566723, at *5 (D.N.J. June 30, 2016). Element (2) is not contested, and as to element (3), I have already found in the previous section that disputed factual issues remain. As to element (1), the remaining issue is whether, as Baymont claims, it only warranted against its own willful misconduct.

The warranty states that the SynXis system will "perform [its] functions and operations in a good workmanlike manner" provided that SB hospitality "(a) follow [BFS]'s instructions, updates and modifications; (b) make corrections, as directed; (c) [pay] all applicable [SynXis] Fees when due; and (d) ... not otherwise [be] in default under the SynXis Agreement, or the Franchise Agreement." (PSOMF ¶ 10.) It further states that Baymont's sole responsibility "shall be to use reasonable efforts to remedy any nonperformance of the SynXis System within a reasonable time after [SB Hospitality] reports such nonperformance to [BFS]." (*Id.*)

As discussed in the previous section, I find that there are factual disputes related to whether the SynXis system functioned properly and whether Baymont used reasonable efforts to remedy whatever issues did arise with the system. Baymont, however, claims that the SynXis subscription agreement also contains a disclaimer (DE 49-7, Ex. B § 10.4) that requires SB Hospitality to waive all claims against Baymont unless they are due to

12

Baymont's "willful misconduct."[8] (Pl. Br. at 20.) Now it is true that SB Hospitality does not point to any record evidence that demonstrates willful misconduct on behalf of Baymont related to the SynXis system. Therefore, if willful misconduct were required to prove a breach of warranty claim, Baymont would be entitled to summary judgment on this counterclaim. I find, however, that the SynXis subscription agreement's "willful misconduct" disclaimer, § 10.4, does not nullify the express warranty, § 10.1, but applies only to other claims.

Part 10 of the SynXis subscription agreement is titled "Warranty and Support" and § 10.1 is titled "General." That section warrants for sixty days that the SynXis system will function in a "good workmanlike manner" if the franchisee follows four conditions, including that the franchisee follow Baymont's instructions; it also provides that Baymont's "sole obligation" is to use "reasonable efforts" to remedy non-performance. (DE 49-7, Ex. B § 10.1.) Next, § 10.2 warrants that the intellectual property in the system belongs to Baymont; § 10.3 provides that there will be a phone number to call for support and that Baymont will provide necessary support. (*Id.* § 10.2–10.3.) Then comes § 10.4, a long, capitalized disclaimer. The disclaimer lays out a number of scenarios in which the above warranties "shall be rendered null and void." These scenarios include improper installation, maintenance by unauthorized service personnel, and damage due to terrorism. It then disclaims any express and implied warranties other than those made expressly in Section 10. Finally, it states that the franchisee waives "all claims or causes of action it may have against [Baymont]… arising out of the [SynXis system], unless due to [Baymont's] willful misconduct." (*Id.* § 10.4.)

The question then is whether the disclaimer allows the franchisee to bring breach of warranty claims only if the SynXis system does not function due to Baymont's willful misconduct. I find that it does not. Most

---

[8]     Section 10.4 is set out in full at n.3, *supra.*

13

fundamentally, the warranty clause guarantees that the SynXis system will function properly, provided that the franchisee pays its fees and follows Baymont's instructions. If the franchisee fulfills these conditions but the system still does not work, requiring the franchisee to prove that the non-functioning of the SynXis system was a result of Baymont's willful misconduct would render the warranty itself meaningless. If Baymont had indeed intended to limit its warranty to cover the SynXis system only in cases where Baymont engaged in willful misconduct such as sabotage or a refusal to train the franchisee's employees (if such a provision could even be considered a warranty) it would have been much more logical to place such a restriction in § 10.1, which already contains a number of limitations on the express warranty.

More fundamentally, I am required to construe the contract as a whole, giving effect to its various parts. *See Hardy ex rel. Dowdell v. Abdul-Matin*, 198 N.J. 95, 103 (2009). It Baymont's warranty were limited to willful misconduct, the intricate formulations of Part 10 would be superfluous and nonsensical. It makes little sense to read the final sentence of Part 10 as nullifying all that came before; if that were intended, Part 10 could have consisted of one or two sentences. I therefore read the disclaimer as a catchall, limiting claims *other than* those granted by the other provisions of Part 10. Even if the parties' contractual intent were regarded as implicating issues of fact, *a fortiori* a jury could so find.

Because the warranty in Part 10 covers the defects of the SynXis system alleged in SB Hospitality's counterclaim, I find that disputed factual issues related to the reasons for the SynXis system's malfunctions preclude summary judgment. I therefore deny summary judgment as to SB Hospitality's second counterclaim.

### 3. Fraud in the inducement

Finally, I must decide whether summary judgment should be granted on SB Hospitality's defense of fraud in the inducement. (DE 19 at 10.) I find that disputed factual issues also preclude summary judgment on this defense. A jury could find (or not find, of course) that the contract was voidable based on

alleged misrepresentations by Baymont's employees at the time of contract formation.

"Fraud in the inducement occurs when someone signs the document they intended to sign, but their assent was induced by a material misrepresentation about facts external to that document. For example, if a party misrepresents that the price of cheese will increase to induce someone into signing a contract to buy milk in bulk, that is fraud in the inducement." *MZM Constr. Co*, 974 F.3d at 405 (citing *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 109 (3d Cir. 2000); 37 Am. Jur. 2d Fraud and Deceit § 2 (2020)). Here, Baymont's representatives allegedly misrepresented the volume of bookings that SB Hospitality would receive, particularly in the summer months, thereby inducing defendants to sign the Franchise Agreement. (Opp. at 5–6; DE 49-5 at 53–54.) To be sure, the falsity of such a representation presents difficulties of proof, but that is not the issue on summary judgment.

The threshold issue, however, is the Franchise Agreement's integration clause and a clause disclaiming that Baymont made any oral or written representation on which SB hospitality relied. (Pl. Br. at 22.) Thus, before I determine if there are factual disputes that preclude summary judgment, I must analyze whether it is appropriate to consider parol evidence. Generally, "the parol evidence rule operates to prohibit the introduction of oral promises to alter or vary an integrated written instrument." *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J. Super. 369, 378 (App. Div. 1960). The rule, however, "does not apply to evidence introduced to show that a contract was void or voidable." *Connors v. Fawn Min. Corp.*, 30 F.3d 483, 493 (3d Cir. 1994) (quoting *Coleman v. Holecek*, 542 F.2d 532, 535 (10th Cir. 1976)). In addition, it is well-settled under New Jersey law that the mere inclusion of a general statement in a contract stating that the parties relied on no oral representations will not necessarily bar the introduction of parole evidence to determine if assent was fraudulently induced and thus the contract is voidable. *Honeysuckle*, 357 F. Supp. 2d at 795 (quoting *Ocean Cape Hotel Corp. v. Masefield Corp.*, 63 N.J.

Super. 369 (1960)). Here, I again follow the court in *Honeysuckle*, which examined a nearly identical disclaimer, and find that the disclaimer does not bar the introduction of parol evidence to support a defense of fraud in the inducement. *See Honeysuckle*, 357 F. Supp 2d at 796. I thus include Nam Min Cho's deposition statements as part of the record.

      In his deposition, Nam Min Cho claimed that Baymont representatives told him during a meeting at a Denny's restaurant that by signing the Franchise Agreement, bookings were "going to increase by 40 to 50 percent." (DE 49-5 at 53.) He also claimed that "Baymont said that sales will go up by a lot if I do the franchise; *and that's why I signed the contract*." (DE 49-5 at 54 (emphasis added).) Baymont argues that these statements are self-serving and therefore cannot defeat summary judgment, and that Nam Min Cho could not identify the Baymont representative who made the alleged misrepresentation. (DE 57 at 4–5.) These arguments fail.

      To be sure, proving the falsity of a representation about future bookings presents certain difficulties, but Baymont is in the business of franchising, so such statements might rightly be relied upon as honestly reflecting its experience. Nam Min Cho's statements are sworn, and a finder of fact could choose to credit them. Similarly, Nam Min Cho's ability to recall the date and location, but not the identity of the speaker, may weaken the credibility of his account, but issues of credibility are not properly considered on summary judgment, provided the necessary minimum quantum of evidence is present. "In considering a motion for summary judgment, a district court may not make credibility determinations … instead, the nonmoving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Marino*, 358 F. 3d at 247 (cleaned up).

      Applying those principles, that factual and credibility issues preclude summary judgment and I therefore deny Baymont's motion for summary judgment on this defense.

**IV.     Conclusion**

Baymont's motion for summary judgment (DE 49) is **GRANTED in part and DENIED in part.** Specifically, the motion is **GRANTED** in favor of Baymont with regard to SB Hospitality's third counterclaim (New York Franchise Sales Act), fourth counterclaim (tortious interference with prospective economic advantage), and with regard to SB Hospitality's unconscionability defense and it is otherwise **DENIED**.


An appropriate order follows.


Dated: June 8, 2022

/s/ Kevin McNulty
_____

Kevin McNulty
United States District Judge